**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JASON HARRELL,

                Petitioner,

v.

CHARLES WARREN, et al.,

                Respondents.

Civil Action No. 12-1479 (MAS)

**OPINION**

**SHIPP, District Judge**

    This matter comes before the Court on Petitioner Jason Harrell's Amended Petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. (ECF No. 21.) Following an order to answer, Respondents filed a response to the Amended Petition (ECF Nos. 25-30), to which Petitioner replied. (ECF No. 33.) For the following reasons, this Court will deny the Petition, and will deny Petitioner a certificate of appealability.

**I.     BACKGROUND**

    In its opinion affirming Petitioner's conviction on direct appeal, the Superior Court of New Jersey – Appellate Division summarized the factual background of Petitioner's convictions as follows:

> [Petitioner] was charged under an indictment with murder . . . and second-degree possession of a weapon with the purpose to use it unlawfully[.] Tried by a jury, [Petitioner] was convicted of the lesser-included offense of aggravated manslaughter, . . . and of the weapons charge. . . .
>
>     This criminal episode arose out of a confrontation between a group of young Hispanic males and a group of young black males

during the early morning hours of August 24, 2003, on the corner of Welton and Hassert Streets in New Brunswick. According to the State's proofs, at around 8:00 p.m. the evening before, Brian Weeks, [Petitioner]'s longtime friend, had been involved in an altercation with a[] Hispanic male, Mario Carpio. Shortly afterwards, Weeks went to retrieve a gun he had earlier stashed away at a George Street home where he and [Petitioner] had been attending a barbecue. Weeks then went to 30 Welton Street, the home of his son's mother, and asked another friend, Tryshon Stokes, to hold the gun for him.

Sometime later, at around 2:00 or 3:00 a.m., Carpio and Weeks met again on Welton Street, this time amidst a crowd of about ten or fifteen Hispanic males and a group of black males standing across the street. Weeks and Carpio began arguing while a number of Hispanic men were in the middle of the street "swinging weapons and all that there stuff." They surrounded Weeks but there was no physical fighting between the two groups and Weeks was not injured in any way. The Hispanic males simply would not let Weeks leave.

By then, [Petitioner] had pulled up to the scene in a truck and observed the crowd encircling Weeks. When [Petitioner] approached a[] Hispanic male holding num chucks but "backing up" from him, Weeks told [Petitioner] to get the gun from Stokes. [Petitioner] complied, left the scene and went to 30 Welton Street to retrieve the gun "to make everyone get away from the area and that was it." Stokes, in turn, was only too willing to relinquish the gun simply . . . "to get [it] out of the house."

[Petitioner] returned to the nearby scene with gun in hand. He exited the truck, brandished the gun, and fired six to eight shots in Weeks' direction. One of the bullets struck Juan Gomez, an innocent bystander, in the chest, killing him.

After the shooting, [Petitioner] discarded the gun and fled in his truck. Another of [Petitioner]'s friends at the scene, Malik Stokes, took the gun to 30 Welton Street where Weeks wrapped it in a handkerchief and threw it into the backyard of 32 Welton Street where it was discovered by police. The next morning, [Petitioner] telephoned Weeks and arranged to meet in Asbury Park where the two boarded a bus to North Carolina later that day. They were arrested four days later. Meanwhile, at the scene of the shooting, four shell casings were located on Welton Street and one shell casing was stuck in the gun. Two bullets had struck a red Toyota parked on Welton Street and one bullet was recovered from the decedent during the autopsy.

> [Petitioner] offered a somewhat different version of the events at trial. Believing Weeks to be in danger from the encircling crowd, [Petitioner] "grabbed the gun from" Tryshon Stokes "to make everybody get away from the area . . . ." According to [Petitioner], the Hispanic youth with the num chucks:
>
>> Was right here in the middle of the street. He's coming towards me. He didn't swing but he had – he had the num chucks in fact but he just didn't swing. He was just looking at me and that's it. There were several other people surrounding the person with the num chucks . . . I mean they wouldn't let [Weeks] go anywhere.
>
> [Petitioner] fired the first two shots in the air and then fired two more shots towards the area where the crowd was surrounding Weeks, but "fired downwards towards the car." Thereafter, Weeks broke free of the crowd and grabbed [Petitioner]'s arm, which caused [Petitioner] to change direction and fire twice more into another street. [Petitioner], however, insisted that he:
>
>> Didn't try to shoot anybody. I didn't try to kill anybody. What happened to Juan was an accident. I didn't try to shoot anybody. I didn't even aim the gun specifically at no person whatsoever. Everything, anything that happened to Juan, I swear, I'm sorry, it was an accident. I did not try to shoot him. He was all the way down the street. There was no way that I intended to shoot this guy.
>
> Evidently crediting the State's account, the jury convicted [Petitioner] of aggravated manslaughter and possession of a weapon for an unlawful purpose.

*State v. Harrell*, 2006 WL 3091630, at *1-2 (App. Div. Nov. 2, 2006), *certification denied*, 192 N.J. 480 (2007).[1]

## II.  LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on

---

[1] A copy of this opinion was provided in the record of this matter (*see* ECF No. 26-17), but that copy is missing several pages.

3

the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta[,]" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

4

## III. DISCUSSION

In his Amended Petition, Petitioner raises three claims for relief: a claim asserting that trial counsel was ineffective in failing to locate additional witnesses to testify that they saw someone grab Petitioner's arm while he was shooting, a claim asserting that his right to Due Process was impugned by the trial court's failure to charge the jury as to self defense rather than just charging them as to defense of others, and a claim alleging that he was denied Due Process when the prosecutor made comments suggesting that Petitioner tailored his testimony and story at trial to the evidence previously presented during the trial. This Court will address each in turn.

Petitioner first alleges that his trial counsel was ineffective in failing to investigate, identify, and call as witnesses various individuals he believes would have testified that someone grabbed his arm while he was firing the gun during the altercation in question. The standard applicable to Petitioner's claims of ineffective assistance of counsel is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's

5

> performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

The Appellate Division rejected Petitioner's claim on the merits, finding that he failed to show that he was prejudiced by the failure to investigate and call these additional witnesses. (*See* ECF No. 30-4 at 9-16.) As the Appellate Division explained, Petitioner essentially testified at trial that he retrieved the gun, fired it twice into the air, and then fired it several more times in the direction of the crowd of people around Weeks, until Weeks grabbed his arm during the final two shots, while Weeks testified that Petitioner fired "eight shots" in the direction of the crowd, but Weeks saw no one, including himself, grab Petitioner's arm during this event. (*Id.* at 10-11.) The purported witnesses Petitioner wishes had been called gave disparate versions of these events – one stated Petitioner shot at Carpio and hit the victim, and at some point was turned by another

6

unspecified person, another told detectives that Petitioner fired into the crowd until a "Spanish kid" grabbed Petitioner's arm to stop him, a third told investigators that he saw Petitioner "going wild" with the gun but did not see the fatal shot or mention anyone grabbing Petitioner, and the last told detectives he saw Petitioner fire five shots directly at someone named "Joell." (*Id.* at 11-13.) The Appellate Division found that these disparate statements of the events did not support Petitioner's specific version of events and would not have directly corroborated his testimony, and in any event none would have supported the defense, as each testified that Petitioner fired into or towards the crowd or some specific individual, which provides direct evidence that Petitioner acted "manifesting extreme indifference to human life," which is the required mens rea for the aggravated manslaughter charge of which Petitioner was convicted. (*Id.* at 14.) As such, even had counsel called these witnesses at trial, the testimony they would have provided would only have supported the conviction Petitioner ultimately received, and it was not likely that the outcome of trial would have been different had they testified. (*Id.* at 14-16.)

This conclusion is well supported by the record and is neither contrary to nor an unreasonable application of *Strickland* and its progeny. Put succinctly, these witnesses would not likely have altered the outcome of Petitioner's trial – each would only have reiterated that Petitioner directly fired towards or into a crowd of people, an action indicative of an extreme indifference to the lives of those in the crowd, ultimately striking and killing the victim. Only one would have provided any support for the contention that Petitioner was grabbed or moved while shooting, and there is no evidence that this specific witness would have testified that this grabbing resulted in the victim being struck. Ultimately, even that is immaterial as someone being struck was certainly within the risk of Petitioner's actions of firing into or towards a large crowd of people with a firearm. All considered, Petitioner has simply failed to show that he was prejudiced by the failure to call these additional witnesses as he has failed to show their testimony would have altered

7

the outcome of his trial. The Appellate Division's rejection of this claim was therefore neither contrary to nor an unreasonable application of federal law, and Petitioner's first claim provides no basis for habeas relief.

In his next claim, Petitioner asserts that he was denied his right to Due Process when the trial court failed to charge the jury as to self defense in addition to defense of others, which was included in the jury charge. That a jury "instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001). A petitioner can therefore only show an entitlement to habeas relief based upon allegedly inadequate jury instructions where the petitioner proves that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). That a challenged instruction was "undesirable, erroneous, or even universally condemned," is insufficient to warrant habeas relief; a petitioner can only prevail on such a claim by showing that the instruction rendered his trial fundamentally unfair. *Id.*

Here, the Appellate Division explicitly rejected the applicability of a self defense, as opposed to defense of others, charge. As explained by the Appellate Division, "the entire thrust of the defense was that [Petitioner] believed his friend Weeks was endangered," and while Petitioner claimed in his testimony to seeing a person with nunchucks, he testified that this person was "backing up" from him prior to the shooting. *Harrell*, 2006 WL 3091630 at *4. Likewise, Petitioner testified that he fired specifically with the intention of helping his friend escape the crowd, and nothing in the evidence at trial suggested any kind of physical altercation or attack against Petitioner during the entire exchange sufficient to place him in a fear of imminent harm sufficient to support a self-defense charge. *Id.* at *4-5. The Appellate Division thus found "no rational basis in the evidence" to support the contention that he acted to defend himself from death

or serious harm, and a self-defense charge was therefore not warranted, and it would have been error under state law *had* the trial judge charged self defense. *Id.* at *5. It is thus clear that a self-defense charge was both improper and unavailable under state law, and that, given the lack of evidence to support such a charge, Petitioner was not denied a fair trial by the refusal of the state courts to provide an unsupported self-defense charge. Petitioner has therefore failed to show any basis for habeas relief on his jury instruction claim. *Duncan*, 256 F.3d at 203.

In his final claim, Petitioner asserts that he was denied a fair trial by prosecutorial misconduct in the form of the prosecutor's comment that he tailored his testimony to the evidence presented at trial. Contrary to Petitioner's assertion, however, the Supreme Court has held that prosecutorial comments suggesting that a criminal defendant tailored his testimony to the previously heard evidence is not improper and does not deny the defendant a fair trial under federal law as the credibility of a defendant who chooses to take the stand is subject to attack or impeachment to the same extent as other witnesses. *Portuondo v. Agard*, 529 U.S. 61, 69-73 (2000). While New Jersey state law may permit a challenge to accusations of tailoring where the petitioner can show that the tailoring argument was generic and not based on the evidence at trial, the Appellate Division in this case found that the prosecutor's statements were "based on the evidence" and were not capable of rendering Petitioner's trial fundamentally unfair in light of the overwhelming evidence of Petitioner's guilt of aggravated manslaughter. *Harrell*, 2006 WL 3091630 at *6-7. That decision was neither contrary to nor an unreasonable application of *Portuondo* or any other controlling federal law. As tailoring comments are permitted under the Constitution and federal law more generally, and as the comment here clearly did not deprive Petitioner of a fair trial insomuch as the evidence of his guilt for aggravated manslaughter was strong and did support a suggestion of tailoring on Defendant's part, Petitioner is not entitled to

9

habeas relief on his tailoring misconduct claim. As all three of Petitioner's claims provide no basis for habeas relief, Petitioner's Amended Petition is denied.

### IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

### V. CONCLUSION

In conclusion, Petitioner's habeas petition (ECF No. 21) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

*/s/ M. Shipp*
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE